Mr. Critchlow. Good morning, Your Honor. Good morning. Is the court ready for my presentation. Yes, you may proceed. May it please the court, David Critchlow on behalf of appellants, the park defendants. Your Honors, we're here today because the district court made three fundamental errors when it granted summary judgment in favor of Valtus Capital, all of which are prescribed by precedent in this circuit. First, it erred ignoring uncontroverted evidence regarding a critical industry term of art and instead applied its own colloquial definition to that industry term of art, equity linked securities, equity linked with a hyphen. Second, the district court erred by effectively integrating separate post agreement transaction documents to inform and construct its judgment that affected that erroneous definition and probably going outside of the four corners of the contract that is at issue for this court and was at issue in the court below. And finally, the district court erred by failing to recognize the existence of numerous disputes of material fact in the record, which precludes summary judgment in this case, and improperly stepping into the shoes of the jury in weighing and assessing the evidence, which is prescribed by the jurisprudence in this circuit. Now, the second circuit. And arguments in kind of tension with each other. I mean, you said on the one hand, she applied her own colloquial definition, which she did. Right. She has a footnote, a dictionary definition of the term linked. And then you said that she relied on the external documents. I mean, is there did the other documents actually inform the meaning of the term equity linked securities? It seems like she relied on a dictionary definition of the term. Oh, we follow the ordinary meaning. And so that was how she determined the meaning of that term. Well, your honor, that's that's an excellent question. And if you're confused, so am I, because the words that she used the court below Judge Cote in her decision is she says that the law requires that the phrase equity linked securities be construed in reference to the entire PPA, which is the only agreement that refers to that term. And then she goes on to say and the other agreements that comprise. I know that I know that she says that. But I guess my my question, my question is, then she goes on to just apply a definition, she says, is based on a dictionary definition of the word linked because New York state courts look to ordinary meaning when a contract doesn't define a term. And she looks at the other contracts only to determine whether they in fact involved equity linked securities, not to inform the definition. So I guess I'm asking you, did it really make a difference? Like, does she really look to the other agreements to define the term? She does. But to answer your question specifically, the first error is using that dictionary definition, because what your honor stated that you're correct about is New York courts, the red courts to look at English definitions, when it is an ordinary word, where there's no dispute right over between you and your opposing counsel over what an election. What the equity linked security is, the bigger question is what it applies to. I think what what judgment Ashley is getting at is that isn't the actual issue, whether or not the contracts are in fact integrated and whether or not that definition in the PPA applies to the whole tranche, as opposed to which of the different definitions get picked. Okay. And the answer to your question, your honor, is no, it does not apply to the whether or not the contracts are integrated, because the contracts that the court tries to integrate are post agreement contracts unrelated to what the PPA is. The PPA is a single agreement that deals within the four corners of that agreement with three parties. Is that appropriate? Is that an appropriate reading, given that it's any gross proceeds, and it was contemplating that your opposing counsel, I'm sorry, your opposing party would bring other people to the table with funding? Yes, it is appropriate because it doesn't contemplate that it just brings other people to the table. It gets to the heart of what equity linked security means. And if I could, we both sides hired experts, because there's a recognition that this is not an English ordinary usage term of art. It is an industry specific term that means that the security itself has an equity component or is equity linked. I'm not sure that the experts actually say that. I mean, they agree about a general definition of an equity linked security as materially connected to a company's common stock. But I don't see them as establishing a real term of art in the sense of a meaning kind of contrary to casual or more general usage that is so notorious and well established that the party sought to be bound was aware of the custom, that the customs existence was notorious. They should have been aware of it. I don't see them in their either in their deposition testimony or in their expert reports as excluding the use that the district court made of it in construing this agreement. Do you believe that they did? Yes, I absolutely believe that they did, Your Honor. I think if you read the deposition of Mr. Brokaw, he's asked those questions specifically and whether documents. He says these documents, they opined differently about whether these documents were included within their own general understanding of equity linked security, but they offer very high level definitions. I mean, materially connected to a company's common stock can be a matter of fact interpreted in different ways by different parties. And as Judge Perez points out, it's a question of the terms application rather than it's a specific definition. That's so notorious that both parties have to be deemed to have accepted it. What's wrong with that understanding? Well, Your Honor, if it's if it's entitled to a different factual interpretation, then I would argue that this is a critical material issue of factual dispute that would have precluded summary judgment. What's wrong with the interpretation is that there is no requirement any longer in the New York law. And we've briefed this point under the UCC, which has provided a comment on this, the restatement and the legislature has spoken that there has to be the type of universal acceptance that was once required at the time. was was decided. Instead, it has to be generally accepted. And what I would what I would urge the panel to consider is that the court reached a conclusion that it could apply its universal its colloquial definition because it didn't see evidence that it was universally accepted. We don't know where the court got that from. There's no evidence that it is. You don't dispute that it applies that that however it was determined. So you get there's some amount of payment that is owed for a few of the tranches. Right. So I guess what I would like for you to focus on is, if we find that they are integrated, that all five of the tranches were integrated, can we still support your rendition of how this case should come out? I would answer that by saying that I think if you did, you would be committing the same error that the court below did, because there is specific guidance. And we've cited the case Asiniagra versus General Motors on what the court must consider before determining whether contracts are integrated. It turns on a question of fact, which this circuit has recognized repeatedly, which should go to the jury. And it turns on the express intent of the parties with whether or not they intended. Before we talk about it being integrated and whatever, when I look at the second lien loan, the second lien loan has the section 4.3 called restructuring that says that the money is only going to flow from the lender after the equity is transferred. Right. That's what it says. So when I look at the second lien loan, why doesn't that just meet the definition of a private placement as any proposed offered sale by the company of equity? Because the second lien loan says you're going to transfer equity and then you're going to get money in return. So forget about the term equity linked securities. Why doesn't that just meet the definition of a private placement because it's a transfer of equity in exchange for money? Because it's not a transfer of equity from that particular financing itself. That financing is a strict loan document. It has an interest rate. It has a typical loan default and technical default provisions. It requires repayment in full. It is tied and relates to other. But it very clearly says we're not going to give you any money unless we get all of the equity. Right. Well, that makes sense. And that's a protection. Why does it make sense? Why does it make sense? Yes, it's a protection for Park because Park is looking for equity contributions and an infusion of capital. If they wanted all debt, they wouldn't have excluded debt from the agreement. And as your honor surely know, debt is simply another liability. Are you just telling me the second lien loan is not a transfer of money in exchange for equity? Yes, I am. The second lien loan is exactly what it states it to be, which is a loan. And with that, your honor, I'm going to reserve. I mean, you can, I'm still asking a question. I didn't feel free Mr. Critchlow to answer Judge Menasche's question. So why is it conditional on the transfer of the equity? I think it's conditional on the transfer of the equity because Park was looking for equity capital infusion in their company. So in some respects, it's a protection for the company as well. They want as well as the investment. Why isn't what you're describing a link to equity? Well, it may be a link to equity in the lay person's English term, which is the problem we think that we made. The definitional term of equity linked isn't as simple as that. Just to step back for a second. I mean, overall, I mean, is your argument that the sale of 55% of the equity of Park was for $42 million and the other $230 million is just a loan that's not connected to the equity? It's not that it's not connected. It's a loan. And the argument is that as the agreement is defined and as investment bankers understand the risk they are taking in order to get the premium percentage that they get for placements and private placements as defined, they are getting that for the equity placement components. And the agreement recognizes that each placement can be an individual placement. But that term is a definition. Actually, it's totally contingent as to whether it was structured this way, right? The first term sheet would have had all of the loans convert into equity. And then it was only subsequent to that, you restructured the whole thing. So you're saying that the entitlement of the placement agent was entirely contingent on how the two parties just happened to structure it. I mean, can I ask you this? If in fact, it was structured that there was one loan for a dollar, and that could be converted into 55% of the company once all of the other loans had gone through for the $270 million. You're saying there would only be an entitlement to a commission on the $1? I've heard that analogy before and read it in the plaintiff's papers in this case. The problem with that analogy is that as much as that would be an absurd commercial result, it's also an absurd analogy. The placement risk that the investment banker takes is largely in its hands. And yes, they take the risk that it's contingent upon whether the investor is willing to commit. There's no allegation in the complaint that Park restructured this to avoid a fee. From time to time, what happens is it was Westmont that was not comfortable giving the bulk of the money in an equity capital infusion or putting $214 million of equity into the company for the 55%. They wanted to break it up into a loan. When that happened, and as you rightly pointed out, this transaction evolved over time. The original term sheet had a full equity loan. It stayed a full equity loan through the first interim advance. When the first interim advance was tied to the second lien loan in December, at that time, it was still anticipated that the second lien loan itself would have a conversion to equity component. It's not until late December and through the spring of 2019 that it was determined that the investors themselves were uncomfortable giving an equity-linked fund. So what accounts for that change? Well, that would be a factual matter that Westmont was not comfortable from a financial perspective committing that amount of equity capital to a company. And there can be a number of reasons we did not propose Westmont. The other side did not propose Westmont. But if I were to speculate, when you give equity, if the company does not survive, your equity is lost. But when you provide pure debt, you still get payment back, even if the company were to go. Was the second lien loan paid back? The second lien loan is being paid back, to the best of my knowledge. It is a loan by its terms. Mr. Critchlow, you've reserved a couple of minutes for rebuttal. We'll hear from you again. We'll hear now from Mr. Schmidt. I thank the panel for your time. Excuse me. Good morning. May it please the court, Joe Schmidt, on behalf of Voltus Capital Group Appley here. I think it became clear by the end of Mr. Critchlow's presentation that I think driven by Westmont, they simply decided they did not want to pay what was owed under the PPA. It's really that simple. And it's been a long struggle. The language in the agreement is unambiguous. It was very simple and straightforward. Wait a second. When you say it's unambiguous, that's what the district court found. But it seemed to me that the district court strayed well beyond the terms of the PPA, which doesn't define equity linked securities, in construing the term and determining what fee was owed to your client. And she did not make a finding that the agreements were all integrated. They all clearly over time were developed and interrelated. Nonetheless, she didn't make a finding of integration. And so I'm wondering how we could find that it's actually unambiguous. The expert testimony conflicts. And, you know, it may be that when you take all the agreements as well as the emails and other correspondence into account, no jury could find that the meaning proffered by Park holds. Nonetheless, is this term really unambiguous when you look just at the PPA? It is, Your Honor. We all know what equity is. We all know what the word linked means. It's an equity. We all know what security means. But the question is, linked is how close need it be linked? One expert said materially connected. Others are looking at a more direct connection. And it seems to me that you have a spectrum that could be encompassed within the phrase. Why is that wrong? Well, no, it was the burden of Park with their expert to define not only establish that it was a term of art, but exactly what that term of art meant. And as we said before, and I think the questioning indicated, it was kept at a very high level. Was it materially connected? Was it involved in a potential issuance of stock? That's all anybody defined it as. We had a rebuttal witness that agreed with that high level analysis. Everybody looked at it. What does it mean to be equity linked? Nobody questioned it throughout the transaction. When you look at that letter… Is your position that that's really all it means? I mean, we are talking about a term that's part of a larger definition of private placement, which is of any proposed offer and sale by the company of equity or equity linked securities. It seems like just from looking at that definition that equity linked security is a kind of anti-circumvention device. It's like, well, we really want a fee for any sale of equity. But if the equity is not offered directly, we're going to have this term equity linked security to capture idiosyncrasies in the nature of the transaction. Does it mean something more specific than that? Or is that really the function of the term in the private placement agreement? Well, remember, the party sat down and we're negotiating an agreement to go out and get an equity investor. So was it going to be 100% equity or was there going to be some that was going to be paid back? That was always on the table. So that was very intentional. And the fact that it's broad doesn't make it ambiguous. In fact, if they wanted something more specific, which seems that they're expert and now Mr. Krischel is arguing for, they should have put it in the PPA. Equity linked was a common term that they used and they used it because it made sense at the time. And remember, you can look at their very, their appellant's brief on page line, the very first iteration of the deal post the PPA being executed. It was going to be a $20 million bridge loan that was going to be fully convertible. And then there was going to be the second lien loan. At that time, it was $240 million of which only some was convertible. So at the very beginning, right after executing the agreement, these bankers, which knew exactly what that term mean, they weren't arguing about it, they weren't indicating any ambiguity. But it changed. I mean, they decided to do something different. I mean, in fact, after the initial agreement, they decided to pay less for the same amount of equity, then there's no doubt that you would get a smaller fee, right? I mean, so the question is just whether the loans were part of the payment for the equity or not. They absolutely were. They were part of the gross proceeds, as the PPA clearly says. I have this question, which is the one I put to Mr. Critchlow, which is when I look at the second lien loan, it shows that the money is not going to flow until the equity is transferred. And why isn't that just a sale of equity? I mean, I think the bankers at least considered the conversion aspect of it to mean why it wasn't straight equity. There were other conditions. But you're absolutely right, Your Honor, in your core analysis is that nothing happened without the second lien loan. That's one argument that's been made, which is that without the second lien loan, the other equities were not going to convert into equity. But if I look at the second lien loan, 4.3 is referring to the transfer of the equity itself. It's saying not until all of this equity is transferred are we going to pay the money. So is that just a sale of equity? You could consider that. I mean, Vaultus always spoke in terms of it being an equity linked security. So we're staying consistent with that. And it absolutely was that. From the beginning of this transaction, the idea was to bring in an equity investor, and then some of the money was going to be repaid. That was always the deal. But as Mr. Crishlow said, that second lien loan was prepared in a way to protect Park. They wanted to eat their cake and have it too. They wanted the equity investor, but they didn't want to not get the money. They could have, in theory, de-linked. Now you're accepting that everybody agreed that some of the money was going to be repaid. So that means that some of the money was a loan and it wasn't payment for equity. No, it's part of the gross proceeds. It always was equity linked securities, because without that money, the equity would be null and void. And if you look at how the third lien is set up, the second lien loan closed on May 7th, but didn't fund until May 9th. It would not have closed without the documentation of the third lien loan being delivered. It was all connected. No equity happened under those agreements until the second lien loan. The term equity linked securities, though, is ambiguous, given the course of the development of this set of transactions. We have two experts who reached opposing conclusions about the second lien loan and the first Intimidate Advance. So what's your response to the argument that that signals that a reasonable jury can come to those two differing conclusions and that this should have gone to a jury? We'd write summary judgment completely out of the federal rules. Rule 56 would no longer be with us if that was the answer. That is not the answer. A reasonable jury with an unsupported expert opinion that simply says and does not, as appellants do not in their brief, they never directly take on, which Judge Coates said very clearly was, you don't get equity without $272 million. You pay the $272 million, you get the equity. That is why it's an equity linked security. For their own protection, they never delink the equity. And I get it. That's how you do these deals. But that's why the expert opinions in this case do not preclude summary judgment. And there definitely should not, in my view, respectfully, ever be a rule where hiring an expert and having them opine and forcing us to get a rebuttal when we know the bankers know. Exactly what it meant from day one should preclude summary judgment. It was clear from day one. Counselor, I'd like to ask, do we have to find that the five Westmont transactions were interrelated or integrated in order to find for your client? They were. They weren't interrelated. I think it's hard to. It's a hypothetical that, I guess, in my view, yeah, if you were to separate them properly, is there a way you could separate them? Like, for example, if Park had said, look to Westmont, hey, we're going to give you 55%. I'm sorry, I might not have been clear. My question is, do we have to find that they were integrated in order to find for your client? I think in this case, I think you do. But I think it's a difficult question because Park would never have done that. Park would never have given them 55% of the equity and they didn't. That's why it was an integrated transaction. As Mr. Christian said, for Park's protection, the money, they want the money before the other side gets the equity. So if they're not integrated, then it would be a different transaction. It would be an entirely different deal, a deal which would not have involved giving controlling interest of a huge casino in Vancouver, British Columbia. Is the PPA, do we have to find that the PPA is integrated with the five financing documents? No, I don't believe so. You're saying that they're integrated because you have to look at the interrelation between the different agreements in order to determine what is an equity-linked security to determine the link to the equity. But in terms of defining the term equity-linked security, that term only appears in the PPA. I don't really see what the other documents do to tell us the meaning of the term. The other documents aren't used to tell the meaning. We're applying them to find out whether they… So you're saying we should see the connections between the second lien loan and the other transactions in order to determine which securities are equity-linked. But in terms of determining the meaning of the term, it seems like you would agree that you could look at just the PPA and just look at the term itself. Absolutely. Yeah, I mean, those five agreements are interrelated because without… Remember, Park has admitted that three of the tranches were equity-linked securities. You're saying interrelated. Do you mean integrated? I mean, integrated to a specific meaning. Yeah. Yeah, integrated. Excuse me, Your Honor. Thank you. Yeah, because Park admitted that three of them were equity-linked securities. But the plain fact of the matter is those equity-linked securities are meaningless from Westmont's perspective unless they supply the second lien loan. Yeah, but isn't there a difference between securities that actually are converted into equity and ones that are just a condition that affects some other transaction? I mean, that's a distinction, isn't it? A distinction without a difference, in our view, Your Honor. In this particular case, it said the gross proceeds were what the compensation was – what was going to gauge the compensation. And here, the gross proceeds necessarily have to be the $272 million because without that, there's no equity. It's essentially arbitrary which loans they said converted into equity and which didn't. I mean, wasn't this the subject of a pretty intense negotiation? At the end of the day, how they structured it, they could have done it any number of ways. But the point of the matter is they kept the purchase price the same. They weren't going to give up that protection, as Mr. Crishlow said. We weren't – Volantis wasn't involved in the end in how they teased out the third lien loan. But the way that actually works is they say, well, we're only going to give you the loan if you've met your other obligations to provide the equity that we have decided in other transactions. I mean, can't you make a loan contingent on lots of events in the world? That doesn't necessarily mean that those events are part of the security, does it? Well, it's reps and warranties. What ends up happening is if the equity isn't validly issued, the loan becomes immediately due. It's an event of default. So any way you look at it, if we don't get the 272, meaning Park, they don't get the equity. And if Westmont doesn't get the equity, they're going to declare a default and immediately pull the money back. They're so integrated, you just can't pull them apart at this point. All right. Thank you. I think we have the arguments. We'll hear rebuttal. Thank you. Mr. Crishlow, you reserved two minutes. Your Honor, I'll be very brief. I'll start with the question that seems to be nagging Judge Menasche, which is an important question, which is why isn't the second lien loan itself equity because it's conditioned upon the equity issuing? And where you were going with the questioning before is precisely right. Those provisions in the reps and warranties are nothing remarkable in this type of transaction. It's designed to protect both parties. There's no way Westmont was going to do a transaction where they gave $214 million in a loan to the Park casinos and did not get their 55% equity interest and all of the equity that they were requiring. That is the sole reason why that second lien loan refers to the fact that before any funds would be issued, that the equity had to convert and it had to be delivered. Doesn't that indicate a form of interdependence that we could read into as being integrated? No, no, it does not. Because what you would have to look at to determine whether there was integration. And remember, we've got to separate the contracts because the question isn't whether simply whether the Westmont transactions are integrated. They're related for sure. It's part of a multi-tiered financing. The question is, is it integrated with the PPA, which is the sole agreement that is before this court. Let's listen to what you just said. You said that there was no way that Westmont was going to give the money if they weren't going to get their of the $230 million, which is in the second lien loan, if they weren't going to get their equity. Doesn't that sound like it's an equity transaction? No, it sounds like it's a loan that is contingent upon other equity transactions closing and converting, which is precisely what it is. If you read 4.3 and you read the agreements. And as your honor noted. But you are saying that there was no way any money, the money in the second lien loan was going to come from Westmont to Park unless Park first transferred equity to Westmont, right? As I understand it, as I understand it, your honor, that was a condition precedent to the loan taking effect and to money being paid. And what Mr. Schmidt is right about, there was a default provision in there. My point is, is that those are standard provisions in various loan documents that be, as your honor pointed out, that can be conditioned upon lots of other events happening in the world and does not create a straight debt transaction into an equity link transaction. The only other thing I'd like to mention, and I would encourage the panel to read the examination of Mr. Purcell, because now there is a statement where they are suggesting that the second lien loan may have had some equity components and it must be integrated. During that examination, their own expert Purcell acknowledged that it is a straight debt instrument. It does not have by itself any conversion characteristics. What Judge Carney is correct about is that the parties vehemently disagree, and there's a material disagreement on what that means and whether that means that, as you have pointed out, a straight English definition could be used to say that because the transactions are in some form related or linked, that that is what defines an equity link security. And the question is simply, there is a material dispute by one of the experts, at least, who says that the transaction and the security itself has to have some conversion component. And Judge Carney, to address your question earlier, that is specifically stated in Brokaw's expert report in express terms. All right. Thank you very much. Thank you for your arguments. We will reserve decision. Thank you, Your Honor.